IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

|  |  |  |
|---|---|---|
| LEAH P. HOLLIS, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 19-cv-3555-LKG |
| | ) | |
| v. | ) | Dated:  April 26, 2024 |
| | ) | |
| MORGAN STATE UNIVERSITY, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## MEMORANDUM OPINION[1]

## I.   INTRODUCTION

In this employment discrimination matter, Plaintiff, Dr. Leah P. Hollis, asserts federal and state law claims for sex discrimination, wage discrimination, leave discrimination and retaliation, related to her employment with Morgan State University (the "University"), against the University and Defendants Gloria Gibson, Glenda Prime, Carolyn Anderson, Myrtle Dorsey, David Wilson and Lesia Crumpton-Young (the "Individual Defendants"), pursuant to Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e; the Maryland Fair Employment Practices Act ("MFEPA"), Md. Code Ann., State Gov't. §§ 20-606 and 20-607; the Equal Pay Act ("EPA"), 29 U.S.C. § 206(d)(1); the Maryland Equal Pay for Equal Work Act ("MEPEWA"), Md. Code, Lab & Empl. § 3-304; Title IX of the Education Amendments of 1972 ("Title IX"), 20 U.S.C. § 1681; 42 U.S.C. § 1983; and the Family and Medical Leave Act ("FMLA"), 29 U.S.C. § 2601.  Defendants have moved for summary judgment on Plaintiff's claims, pursuant to Fed. R. Civ. P. 56.  ECF No. 86.  Plaintiff has also moved for summary judgment on her wage discrimination claims, pursuant to Fed. R. Civ. P. 56.  ECF No. 95.  These motions are fully briefed.  ECF Nos. 101, 105.  No hearing is necessary to resolve the motions.

---

[1] The Court initially issued this opinion under seal on April 26, 2024 to allow the parties to review the opinion and request any redactions of sensitive information.  ECF No. 108.  On May 10, 2024, the parties filed a joint status report stating that they do not seek any redactions. ECF No. 110. And so, the Court issues the public version of this opinion without redactions.

*See* Local Rule 105.6 (D. Md. 2023).  For the reasons that follow, the Court: (1) **GRANTS** Defendants' motion for summary judgment; (2) **DENIES** Plaintiff's cross-motion for partial summary judgment; and (3) **DISMISSES** the amended complaint.

## II.    FACTUAL AND PROCEDURAL BACKGROUND[2]

### A.    Factual Background

In this employment discrimination matter, Plaintiff asserts federal and state law claims for sex discrimination, wage discrimination, leave discrimination and retaliation against the Defendants, pursuant to Title VII, the MFEPA, the Equal Pay Act, the MEPEWA, Title IX, Section 1983, and the FMLA.  Specifically, Plaintiff asserts the following 10 claims in the amended complaint: (1) Title VII-Employment Discrimination on the Basis of Sex (Count I); (2) MFEPA-Employment Discrimination on the Basis of Sex (Count II); (3) Equal Pay Act-Pay Discrimination on the Basis of Sex (Count III); (4) MEPEWA-Pay Discrimination on the Basis of Sex (Count IV); (5) Title VII-Retaliation (Count V); (6) MFEPA-Retaliation (Count VI); (7) Title IX-Employment Discrimination and Retaliation on the Basis of Sex (Count VII); (8) Section 1983-14th Amendment Equal Protection (Count VII); (9) MFEPA-Discriminatory Compensation Practices (Count IX); and (10) FMLA Interference and Retaliation (Count X). ECF No. 43-1.  As relief, Plaintiff seeks, among other things, back pay, front pay, appointment to a tenured Full Professor position at the University, certain injunctive relief and to recover attorney's fees and costs from the Defendants.  *Id*. at 44-45.

<u>The Parties</u>

Plaintiff, Dr. Leah P. Hollis, is a Black female professional educator, who has worked in the field of college student education for more than two decades.  Plaintiff was formerly employed by the University as a professor and she resides in Pennsylvania.  *Id.* ¶¶ 1, 9; ECF No. 101 at 4, n.1.

Defendant Morgan State University is a public urban research university located in Baltimore, Maryland.  ECF No. 43-1 at ¶ 10.  The University is a historically Black college and

---

[2] The facts recited in this memorandum opinion are taken from Plaintiff's amended complaint; Defendants' motion for summary judgment; the memorandum in support thereof; Plaintiff's cross-motion for partial summary judgment; and the memorandum in support thereof.  ECF Nos. 43, 86, 95.  Because the parties have filed certain materials and exhibits related to their cross-motions under seal, the Court files this memorandum opinion under seal out of abundance of caution.

university ("HBCU") and doctoral research institution.  *Id.*  The University is an "employer" under Title VII, the EPA, Title IX, the FMLA and Maryland state law.  *Id.* ¶ 11.

Defendant Gloria Gibson is a resident of Illinois.  *Id.* ¶ 12.  At all times relevant to this matter, Dr. Gibson was the University's Provost and Senior Vice President of Academic Affairs. *Id.*  Dr. Gibson resides in Illinois.  *Id.*

Defendant Glenda Prime is a resident of Maryland. *Id.* ¶ 13.  At all times relevant to this matter, Dr. Prime was the Department Chair of the University's Department of Advanced Studies, Leadership and Policy (the "Department"), and later Dean of the University's School of Education and Urban Studies ("SEUS").  *Id.*

Defendant Carolyn Anderson is a resident of Maryland.  *Id.* ¶ 14.  At all times relevant to this matter, Dr. Anderson was the Program Director of the University's Community College Leadership Program (the "CCLP") in the Department, and later the interim chair of the Department*. Id.*

Defendant Myrtle Dorsey is a resident of Maryland.  *Id.* ¶ 15.  At all times relevant to this case, Dr. Dorsey was the Program Director of the CCLP.  *Id.*

Defendant David Wilson is a resident of Maryland.  *Id.* ¶ 16.  At all times relevant to this case, Dr. Wilson was the President of the University.  *Id.*

Defendant Lesia Crumpton-Young was a resident of Maryland at all relevant times to this case.  *Id.* ¶ 17.  At all times relevant in this case, Dr. Crumpton-Young was the Provost of the University.  *Id.*

<u>Plaintiff Is Hired By The University</u>

Plaintiff earned her Doctor of Education (Ed.D.) degree from Boston University in 1998. ECF No. 86-15 (Def. Ex. 13); ECF No. 86-9 (Def. Ex. 7, Hollis Tr.) at 5 (15:7-16:1).  Prior to her employment with the University, Plaintiff served in a variety of administrative and non-tenured positions at various institutions.  ECF No. 86-15 (Def. Ex. 13).

In January 2014, the University sought applicants with specialized experience "in community college or higher education administration" to fill a position in the Department's CCLP.  ECF No. 86-16 (Def. Ex. 14); ECF No. 86-17 (Def. Ex. 15, Prime Tr. 1) at 7 (36:21-37:12).  And so, Plaintiff applied for this position and Dr. Prime recommended that the University hire Plaintiff.  ECF No. 86-9 (Def. Ex. 7, Hollis Tr.) at 23 (85:8-11); ECF No. 86-116 (Def. Ex. 114) at 9, ¶ 25; ECF No. 86-21 (Def. Ex. 19).

On February 20, 2014, the University offered Plaintiff a tenure-track Assistant Professor position in the Department, which is housed in the SEUS.  ECF No. 86-22 (Def. Ex. 20).  And so, Plaintiff accepted a three-year contract as an Assistant Professor in the Department's CCLP.  ECF No. 86-22 (Def. Ex. 20); ECF No. 86-9 (Def. Ex. 7, Hollis Tr.) at 19 (71:22-72:7).

It is undisputed that Plaintiff's starting salary at the University was $60,000.  ECF No. 86-22 (Def. Ex. 20).  In this regard, the Defendants acknowledge that this salary was at the bottom of the starting salary range for Assistant Professors in the CCLP at the time.  ECF No. 86-7 (Def. Ex. 5, Prime Tr. 2) at 4-5 (17:6-18:17).  Defendants allege, however, that Dr. Prime recommended a lower starting salary for Plaintiff, because of Plaintiff's lack of prior community college-focused experience, specialization, or research, and due to concerns expressed by members of the University's search committee about the quality of the venues in which Plaintiff had published.[3]  ECF No. 86-1 at 10-11 (*citing* ECF No. 86-7 (Def. Ex. 5, Prime Tr. 2) at 4-5, 6 (17:19-18:17, 23:19-24:11)).

<u>Plaintiff's 2016 Tenure Application</u>

In August 2016, Plaintiff submitted an application for tenure and promotion to Associate Professor (the "2016 Tenure Application").  ECF No. 98-11 (Pl. Ex. 26); ECF No 86-9 (Def. Ex. 7, Hollis Tr.) at 24 (91:18-92:4).  And so, Dr. Prime convened a three-member departmental review committee to review Plaintiff's application, which was comprised of the following professors: Whitney Johnson, Benjamin Welsh, and Robin Spaid.  ECF No. 88-2 (Def. Ex. 25); ECF No. 88-3 (Def. Ex. 26); ECF No. 88-4 (Def. Ex. 27); ECF No. 88-5 (Def. Ex. 28); ECF No. 88-6 (Def. Ex. 29) at 2-3, ¶¶ 3-4; ECF No. 86-13 (Def. Ex. 11) at 1, ¶ 2.  Dr. Welsh and Dr. Spaid voted in favor of awarding Plaintiff tenure and promotion.  ECF No. 88-4 (Def. Ex. 27); ECF No. 88-5 (Def. Ex. 28); ECF No. 88-6 (Def. Ex. 29) at 2-3, ¶¶ 3-4.  But Dr. Johnson voted against recommending Plaintiff for promotion and tenure, because she was concerned that, of the books published by Plaintiff since her hire, one book was self-published by Plaintiff's consulting

---

[3] At the time Plaintiff applied to the University for the Assistant Professor position, her previous employment included non-tenured faculty positions at two private, for-profit universities, and her scholarly publications were all self-published by her consulting company.  ECF No. 86-9 (Def. Ex. 7, Hollis Tr.) at 6, 60 (17:19-21, 236:7-10); ECF No. 86-15 (Def. Ex. 13).

company and the other was a book for which Plaintiff was the editor and sole author of eight of the ten chapters. ECF No. 88-3 (Def. Ex. 26).

Dr. Johnson also noted, among other things, that, although one of Dr. Hollis's articles had been accepted for review by the *Journal of Negro Education*, a letter from the journal's editor indicated that "extensive revisions are required for publication" because the article contained "errors concerning grammar, typographical errors, punctuation and APA formatting[.]" *Id.* And so, Dr. Johnson concluded that the comments from Plaintiff's editors "suggest that she is submitting work that isn't ready for publication," and that applying for tenure at a later date would give Plaintiff time to improve her dossier. *Id.* at 4.

Following the departmental review committee's review, Dr. Prime made a separate evaluation and recommended that Plaintiff's 2016 Tenure Application be deferred, and that Plaintiff be given an additional year to improve her submission. ECF No. 86-32. In making this recommendation, Dr. Prime noted that, "a closer analysis of [Plaintiff's] publications raises serious questions about the actual depth of her scholarly work." *Id.* at 2. And so, Dr. Prime concluded:

> Dr. Hollis is without doubt a promising scholar. She understands the value of networking within the academic community and is skilled at seeking opportunities for her own recognition as a scholar. With respect to her research, it is my view that quality has been sacrificed in the pursuit of quantity. Publication in paid journals, and in journals on which one is a member of the editorial board do not engender confidence in their academic contribution and do not carry much weight in the evaluation of scholarship. Dr. Hollis is active in academic arenas and has several pieces of work, including 2 grants, one internal to Morgan, and one to an external agency that are currently under review. Dr. Hollis is only in her second year as an assistant professor and this dossier gives evidence of potential rather than of accomplishments for the award of promotion and tenure. I recommend a **Deferral** on both her application for promotion and on the award of tenure. This would give her the time needed to truly develop herself as a scholar.

*Id.* at 3 (emphasis in original).

Dean Patricia Welch, the Dean of the SEUS at the time, also reviewed Plaintiff's 2016 Tenure Application and made a recommendation to defer the application for a year. ECF No. 86-33 (Def. Ex. 31); ECF No. 86-13 (Def. Ex. 11) at 1, ¶ 2. Because Dean Welch did not initially convene a school review committee before reviewing Plaintiff's application, she,

subsequently, convened a five-member school review committee to review the application in May 2017. ECF No. 88-7 (Def. Ex. 32); ECF No. 86-138 (Def. Ex. 136) at 1, ¶ 2. The school review committee consisted of the following professors: Sylvester McKay; Lurline Whittaker, Charles Carter, Roni Ellington and Iola Ragins Smith. ECF Nos. 88-8, 88-9, 88-10, 88-1, 88-12 (Def. Exs. 33-37); ECF No. 86-13 (Def. Ex. 11) at 1, ¶ 2. Each of the school review committee members expressed concerns in their evaluation forms about the fact that Plaintiff had published in "pay-to-publish" venues and all committee members voted against granting Plaintiff promotion and tenure. *Id.*

Dean Welch submitted the departmental review committee's review forms, Dr. Prime's recommendation, the school review committee's review forms, and her own recommendation to the University's Provost, Dr. Gloria Gibson. In May 2017, Provost Gibson determined that she would recommend to the University's President that Plaintiff be offered a one-year extension of time to resubmit her application. ECF No. 86-41 (Def. Ex. 39); ECF No. 86-13 (Def. Ex. 11) at 1, ¶ 2. Thereafter, President Wilson sent a letter to Plaintiff offering a one-year extension of time for Plaintiff to re-submit her application. ECF No. 86-44 (Def. Ex. 42); ECF No. 86-13 (Def. Ex. 11) at 1, ¶ 2.

On May 30, 2017, Plaintiff appealed President Wilson's decision. ECF No. 86-45 (Def. Ex. 43); ECF No. 86-8 (Def. Ex. 6, Gibson Tr.) at 10 (56:20-57:5). During the appeal, Plaintiff alleged that she had been subjected to sex discrimination and unequal pay while employed at the University. ECF No. 86-45 (Def. Ex. 43), ECF No. 86-9 (Def. Ex. 7, Hollis Tr.) at 35 (134:18-135:5).

In September 2017, Provost Gibson convened a three-member faculty appeals committee to consider Plaintiff's appeal, which was comprised of the following professors: Dr. Yvonne Bronner, Dr. Halaevalu Vakalahi, and Dr. Farin Kamanagar. ECF No. 88-15 (Def. Ex. 45). On September 22, 2017, the committee advised President Wilson that it had not found a violation of the University's procedures in the promotion and tenure review process for Plaintiff. *Id.* And so, the committee recommended that Plaintiff's appeal be denied. *Id.*

Despite the fact that the University reviewed Plaintiff's 2016 Tenure Application, Defendants maintain that this application was untimely, because it should not have been submitted until the third Monday in September of Plaintiff's second year of employment, pursuant to the University's policy and Plaintiff's employment contract. ECF No. 86-1 at 12

(*citing* ECF No. 86-3 (Def. Ex. 1) at 6; ECF No. 86-23 (Def. Ex. 21)). [4]  And so, on December 12, 2017, President Wilson sent a letter to Plaintiff notifying that her appeal was denied, because her 2016 Tenure Application was untimely.  ECF No. 88-16 (Def. Ex. 46); ECF No. 86-112 (Def. Ex. 110, Wilson Tr. 1) at 13 (215:4-19).  On the same day, Dr. Gibson wrote to Plaintiff to explain why the University believed the 2016 Tenure Application was untimely and Dr. Gibson informed Plaintiff that she was now an at-will employee, because she never applied for a second three-year contract in accordance with the schedule set forth in the University's APT Policy.  ECF No. 88-17 (Def. Ex. 47); ECF No. 86-8 (Def. Ex. 6, Gibson Tr.) at 13 (84:20-85:8).

### Plaintiff's 2017 Application For The CCLP Director Position

In April 2017, Plaintiff applied for the CCLP Director Position at the University.  ECF No. 86-77 (Def. Ex. 75); ECF No. 86-54 (Def. Ex. 52, Dorsey Tr.) at 6 (38:21-39:7).  The eight-member search committee for this position unanimously recommended that the University hire another candidate, Dr. Myrtle Dorsey, who is a woman.  ECF No. 86-53 (Def. Ex. 51, Anderson Tr.) at 19 (222:1-5); ECF No. 86-7 (Def. Ex. 5, Prime Tr. 2) at 15 (190:7-191:20).  Defendants allege that Dr. Dorsey was the best candidate for this position, because of her extensive community college leadership experience and extensive connections within the community college sector nationwide.  ECF No. 86-78 (Def. Ex. 76); ECF No. 86-53 (Def. Ex. 51, Anderson Tr.) at 19 (224:18-225:17).  Plaintiff alleges that she was informed that she was no longer being considered for the position in September 2017.  ECF No. 43-1 at 17, ¶ 52.

### Plaintiff's 2018 FMLA Leave

From January 22, 2018, to April 2, 2018, Plaintiff took an approved leave of absence to care for her mother under the Family Medical Leave Act.  ECF No. 51 (Def. Ex. 49); ECF No. 86-135 (Def. Ex. 133) at 2, ¶ 2.  Upon Plaintiff's return to work, she was not assigned to teach classes during the final five weeks of the spring 2018 semester.  ECF No. 55 (Def. Ex. 53); ECF No. 86-54 (Def. Ex. 52, Dorsey Tr.) at 8 (130:7-131:2); ECF No. 86-53 (Def. Ex. 51, Anderson Tr.) at 17 (171:21-172:3).  Defendants allege that this was because Plaintiff was scheduled to

---

[4] It is undisputed that, when Plaintiff joined the University's faculty, faculty appointments, tenure, and promotions were governed by the University's policies and procedures on appointment, promotion and tenure, as approved by the University's board of regents on April 13, 2004 (the "2004 APT Policy"). ECF No. 86-3 (Def. Ex. 1).  It is also undisputed that Plaintiff received a copy of the 2004 APT Policy prior to commencing her duties at the University.  ECF No. 86-9 (Def. Ex. 7, Hollis Tr.) at 23 (85:18-20, 86:5-10); ECF No. 86-25 (Def. Ex. 23); ECF No. 86-10 (Def. Ex. 8).

return to work just one day before the start of the final term and classes for the semester had already been assigned.  ECF No. 86-1 at 18 (citing *id.*).

It is undisputed that when Plaintiff returned to work in April 2018, Dr. Dorsey requested that Plaintiff submit weekly reports documenting her activities.  ECF No. 86-54 (Def. Ex. 52, Dorsey Tr.) at 8-9 (133:5-22; 136:12-19).  On or about May 17, 2018, President Wilson informed Plaintiff of: (1) his decision to grant her a second three-year contract, and (2) that she must apply for tenure and promotion during her fifth year of employment during the fall of 2018.  ECF No. 88-19 (Def. Ex. 56); ECF No. 86-13 (Def. Ex. 11) at 1, ¶ 2.

Plaintiff's Summer 2018 Class Assignment

In the spring semester of 2018, Plaintiff requested to teach two summer courses at the University, pursuant to the University's policy of offering faculty with 9.5-month appointments the opportunity to seek to teach summer classes.  ECF No. 86-54 (Def. Ex. 52, Dorsey Tr.) at 12 (155:14-156:7); ECF No. 86-53; ECF No. 95-15 (Pl. Ex. 14).  It is undisputed that Dr. Dorsey assigned Plaintiff one summer class.  ECF No. 86-59 (Def. Ex. 57).  Defendants allege that the decision to assign Plaintiff one summer class was based upon the number of courses offered at the University and the number of other faculty members who wanted to teach summer classes in 2018.  ECF No. 86-1 at 19; *see also* ECF No. 86-54 (Def. Ex. 52, Dorsey Tr.) at 7, 11 (99:15-17, 151:3-152:2) (Dr. Dorsey testifying that she attempts to assign summer classes in a manner that is fair and equitable to all faculty and that keeps students together with their assigned cohort); ECF No. 86-60 (Def. Ex. 58, Grant Tr.) at 6 (71:1-72:21).  Plaintiff alleges that her summer class assignment was made in retaliation for taking FMLA leave, and that she lost pay because she was only assigned one summer class.  ECF No. 95-1 at 80.

Plaintiff's 2018 Tenure Application And Promotion

In September 2018, Plaintiff again applied for tenure and promotion to Associate Professor (the "2018 Tenure Application").  ECF No. 43-1 ¶ 37.  And so, Dr. Prime convened a departmental review committee to review Plaintiff's application, which was comprised of the following professors: Whitney Johnson, Benjamin Welsh, Roni Ellington, Dia Sekayi, and Robin Spaid.  ECF Nos. 88-20, 88-21, 88-22, 88-23, 88-24, 88-25 (Def. Exs. 59-64); ECF No. 86-13 (Def. Ex. 11) at 1, ¶ 2.  All members of the committee voted in favor of granting Plaintiff tenure and promotion.  *Id.*  But Dr. Prime recommended against Plaintiff's tenure and promotion.  ECF No. 86-116 (Def. Ex. 114) at 8-9, ¶ 26; ECF No. 88-26 (Def. Ex. 65).

Thereafter, Dean Welch convened a school review committee to review Plaintiff's application, which was comprised of the following professors:  C. Sean Robinson, Glendola Mills, Thurman Bridges, Simone Gibson and Marjorie Adams.  ECF Nos. 88-27, 88-28, 88-29, 88-30, 88-31 (Def. Exs. 66-70); ECF No. 86-13 (Def. Ex. 11) at 1, ¶ 2.  All members of the school review committee recommended that Plaintiff be granted tenure and promotion.  *Id.*  Dean Welch and Interim Provost Dr. Anna McPhatter also recommended that Plaintiff's application be granted.  ECF No. 88-32 (Def. Ex. 71); ECF No. 86-13 (Def. Ex. 11) at 1, ¶ 2.  And so, in May 2019, President Wilson granted Plaintiff tenure, promoted Plaintiff to the position of Associate Professor, and approved an increase in Plaintiff's salary.  ECF No. 88-33 (Def. Ex. 72); ECF No. 88-34 (Def. Ex. 73); ECF No. 86-76 (Def. Ex. 74); ECF No. 86-13 (Def. Ex. 11) at 1, ¶ 2.

<u>Plaintiff's 2019 Application For The Higher Education Program Position</u>

In January 2019, Plaintiff applied for a tenure-track, open-rank position in the University's Higher Education Program.  ECF No. 86-95 (Def. Ex. 93); ECF No. 86-116 (Def. Ex. 114) at 9, ¶ 28.  A search committee, which was comprised of Professors Benjamin Welsh, C. Sean Robinson, Omari Jackson, Krishna Bista and Vanessa Dodo Seriki, reviewed Plaintiff's application.  ECF No. 88-5 (Def. Ex. 28); ECF No. 88-6 (Def. Ex. 29) at 3, ¶ 7; ECF No. 86-96 (Def. Ex. 94) at 2, ¶ 3.  None of the search committee members ranked Plaintiff among the top candidates for the position.  *Id.*  And so, Plaintiff was not interviewed for the position.  *Id.*  The University ultimately offered the position to Virginia Byrne, who is a woman.  ECF No. 86-97 (Def. Ex. 95); ECF No. 86-116 (Def. Ex. 114) at 10, ¶ 29.  Defendants allege that the University hired Dr. Byrne for this position because she had experience in marketing and social media, as well as special skills with technology and online teaching.  ECF No. 86-1 at 20 (*citing* ECF No. 86-53 (Def. Ex. 51, Anderson Tr.) at 7-8 (109:2-8, 110:5-13, 113:7-10)).

<u>Plaintiff's 2019 Application For Promotion To Full Professor</u>

In September 2019, Plaintiff submitted a dossier and application for promotion to Full Professor at the University (the "2019 Promotion Application").  ECF No. 86-6 (Def. Ex. 4, Young Tr. 2) at 8-9 (41:3-42:5); ECF No. 88-35 (Def. Ex. 77).  Plaintiff's application was reviewed by a department committee comprised of the following professors: Lorece V. Edwards, Siddhartha Sen, and Seth Vannatta.  ECF Nos. 88-36, 88-37, 88-38, 88-39 (Def. Exs. 78-81); ECF No. 86-13 (Def. Ex. 11) at 1, ¶ 2.

Professors Sen and Edwards voted against promotion and Professor Vannatta initially

abstained, but later joined the other two committee members in voting against promotion.  *Id.*  In reaching the decision to vote against promotion, the committee members observed that Plaintiff's dossier did not show any integration of her teaching, research and service, or explain her teaching pedagogy, and that Plaintiff's publication record included fee-based publications and self-published works, as opposed to publications by academic presses.  ECF No. 88-36 (Def. Ex. 78).

Plaintiff's 2019 Promotion Application was also reviewed by a school review committee, comprised of the following professors: M'Bare N'Gom, Maurice Taylor, Jumoke Ladeji-Osias, Jerome Schiele and David Marshall.  ECF Nos. 88-40, 88-41, 88-42, 88-43, 88-44, 88-45 (Def. Exs. 82-87); ECF No. 86-13 (Def. Ex. 11) at 1, ¶ 2.  Four of the school review committee members voted against Plaintiff's promotion and one committee member voted in favor of promotion.  *Id.*

Dr. Prime also reviewed Plaintiff's 2019 Promotion Application and recommended against promotion.  ECF No. 88-46 (Def. Ex. 88); ECF No. 86-12 (Def. Ex. 10, Prime Tr. 3) at 4 (25:6-16); ECF No. 86-116 (Def. Ex. 114) at 10, ¶ 27.  In her recommendation, Dr. Prime observed, among other things, that: (1) Plaintiff had provided only two student evaluations and two peer reviews, all of which predated 2017; (2) Plaintiff had chaired only five dissertations since coming to the University; (3) two of Plaintiff's books were self-published and the others were published by presses that were not regarded as of high academic standing; (4) none of Plaintiff's books had been published since her promotion to Associate Professor; (5) only five of Plaintiff's published articles were published after her last promotion; and (6) Plaintiff's service to the Department and SEUS had been minimal.  ECF No. 88-46 (Def. Ex. 88).

Provost Lesia Crumpton-Young also evaluated Plaintiff's 2019 Promotion Application and recommended against promotion.  ECF No. 88-47 (Def. Ex. 89); ECF No. 86-6 (Def. Ex. 4, Young Tr. 2) at 10 (61:11-65:18).  Thereafter, President Wilson reviewed Plaintiff's application, and the recommendations of the University's faculty, and he made the final determination to deny Plaintiff's application.  ECF No. 86-92 (Def. Ex. 90); ECF No. 86-13 (Def. Ex. 11) at 1, ¶ 2.

<u>Plaintiff's 2020 Application For Promotion To Full Professor</u>

In the fall of 2020, Plaintiff again applied for promotion to the rank of Full Professor (the "2020 Promotion Application").  ECF No. 88-49 (Def. Ex. 97); ECF No. 86-116 (Def. Ex. 114)

at 10, ¶ 30.  A departmental review committee comprised of Professors C. Sean Robinson, Yvonne Bronner, and Seth Vannatta reviewed Plaintiff's application, and the committee members voted unanimously against promotion.  ECF Nos. 88-50, 88-51, 88-52 (Def. Exs. 98-100); ECF No. 86-13 (Def. Ex. 11) at 1, ¶ 2.  A school review committee comprised of Maurice Taylor, David Marshall, Jerome Schiele, Jocelyn Turner-Musa, Jumoke Ladeji-Osias and M'bare N'gom also reviewed Plaintiff's application.  ECF Nos. 88-53, 88-54, 88-55, 88-56, 88-57, 88-58, and 88-59 (Def. Exs. 101-107); ECF No. 86-13 (Def. Ex. 11) at 1, ¶ 2.  Two members of the school review committee voted in favor of promotion and four members of the committee voted against the promotion.  *Id.*  Dr. Prime also recommended against Plaintiff's promotion.  ECF No. 88-60 (Def. Ex. 108); ECF No. 86-116 (Def. Ex. 114) at 10, ¶ 31; ECF No. 87-6 (Ex. 10, Prime Tr. 3) at 5-6 (89:5-90:18).

In May 2021, Provost Young sent a letter to Plaintiff advising that she was recommending denial of Plaintiff's 2020 Promotion Application.  ECF No. 86-11 (Def. Ex. 9, Young Tr. 3) at 3 (19:6-20:17); ECF No. 86-111 (Def. Ex. 109).  Plaintiff filed an appeal of the denial decision on May 20, 2021, alleging multiple procedural errors and violations.  ECF No. 95-20 (Pl. Ex. 19).

<u>Plaintiff's Salary And The University's Salary Determination Practices</u>

There are several facts about Plaintiff's salary and compensation that are material to this employment discrimination dispute.

First, it is undisputed that the University does not have written guidelines, procedures, or salary ranges for setting initial salaries for newly hired faculty.  ECF No. 86-1 at 24 (*citing* ECF No. 86-17 (Def. Ex. 15, Prime Tr. 1) at 9 (46:7-47:3); ECF No. 86-112 (Def. Ex. 110, Wilson Tr. 1) at 7-8 (64:22-67:15)).  Defendants allege, however, that the University has unwritten ranges for setting salaries within the SEUS.  *Id.* (*citing* ECF No. 86-17 (Def. Ex. 15, Prime Tr. 1) at 9 (46:19-47:3)).

In this regard, Defendants allege that initial salaries are determined by the Provost and based upon the recommendations provided by the Department Chair and Dean.  *Id.* (*citing* ECF No. 86-17 (Def. Ex. 15, Prime Tr. 1) at 11, 14 (58:5-10, 74:3-20); ECF No. 86-5 (Def. Ex. 3, Young Tr. 1) at 10 (54:7-55:5);  ECF No. 86-112 (Def. Ex. 110, Wilson Tr. 1) at 9 (78:13-81:1)).  In addition, Defendants allege that salary increases are generally provided as: (1) cost-of-living increases provided to all State employees; (2) merit increases that are available only when

approved by the Maryland General Assembly; (3) increases for promotions; (4) compensation for assuming administrative duties; and (5) counteroffers to retain faculty being recruited by other universities. *Id.* (citing ECF No. 86-17 (Def. Ex. 15, Prime Tr. 1) at 17, 19-20 (107:1-9, 129:20-131:1); ECF No. 86-5 (Def. Ex. 3, Young Tr. 1) at 8, 14 (31:4-21, 75:5-76:6); ECF No. 86-112 (Def. Ex. 110, Wilson Tr. 1) at 10, 11-12 (144:5-145:4, 152:12-155:17)).  And so, Defendants maintain that, typically, Associate Professors earn more than Assistant Professors within the same discipline; Full Professors earn more than Associate Professors; and that salaries can vary even among professors of the same rank.  *Id. (citing* ECF No. 86-5 (Def. Ex. 3, Young Tr. 1) at 12, 13-14, 15 (67:1-17, 72:11-74:11, 174:1-22)).

Second, it is undisputed that the initial salary range for Assistant Professors in the University's SEUS is $60,000 to $65,000.  ECF No. 86-17 (Def. Ex. 15, Prime Tr. 1) at 10 (56:18-57:2).  It is also undisputed that Plaintiff received a starting salary of $60,000 when she joined the University in 2014, and that Plaintiff has received all cost-of-living adjustment increases authorized by the State of Maryland during her employment with the University.  *Id*.

In addition, it is undisputed that Plaintiff received the standard increase of $2,000 when she achieved tenure and promotion to Associate Professor in 2019.  ECF No. 86-9 (Def. Ex. 7, Hollis Tr.) at 65 (256:11-18); ECF No. 86-76 (Def. Ex. 74).  A chart summarizing Plaintiff's salary history at the University is set forth below:

| Date | Type of Increase | Amount of Increase | Resulting Salary |
|---|---|---|---|
| Aug. 20, 2014 | Initial Salary | | $60,000.00 |
| Jan. 1, 2015 | COLA | 2.00% | $61,200.00 |
| July 1, 2016 | Merit | 0% | $61,200.00 |
| Jan. 1, 2019 | COLA | 2.00% | $62,424.00 |
| Apr. 1, 2019 | COLA | 0.5% | $62,736.12 |
| July 1, 2019 | COLA | 3.00% | $64,619.00 |
| Aug. 23, 2019 | Promotion & Tenure | $2,000 | $66,619.00 |
| Jan. 1, 2020 | COLA | 1.00% | $67,285.00 |
| Jan. 1, 2021 | COLA | 2.00% | $68,632.00 |
| Jan. 1, 2022 | COLA/Merit | 3.5% | $71,052.00 |
| July 1, 2022 | COLA/Merit | 5.5% | $74,960 |

*See* ECF No. 86-9 (Def. Ex. 7, Hollis Tr.) at 65-66 (255:1-258:11); ECF No. 86-113 (Def. Ex. 111).

Third, Plaintiff has identified ten male colleagues, who she uses as salary comparators, to show that the University paid her a lower salary than similarly situated male employees for the same work. *See* ECF No. 43-1 ¶¶ 22-31. The salaries and professional backgrounds for these comparators are set forth below.

Dr. Needham Gulley was hired by the University in 2014 as an Assistant Professor in the Department's CCLP, at a starting salary of $63,000. ECF No. 86-17 (Def. Ex. 15, Prime Tr. 1) at 14 (80:10- 81:8); ECF No. 86-114 (Def. Ex. 112). It is undisputed that Dr. Gulley holds a Ph.D. in College Student Affairs Administration and that his dissertation topic related to community college leadership. ECF No. 86-17 (Def. Ex. 15, Prime Tr. 1) at 15 (82:4-83:1). At the time of his hire, Dr. Gulley had published in the *Community College Journal of Research and Practice*, which is focused on research relevant to community colleges. *Id.* (84:15-85:20); ECF No. 86-115 (Def. Ex. 113). Defendants allege that Dr. Prime recommended that Dr. Gulley's starting salary be in the middle of the salary range for newly hired Assistant Professors, because his educational background, experience and scholarship made him a good fit for the CCLP. ECF No. 86-17 (Def. Ex. 15, Prime Tr. 1) at 14-16 (79:16-88:9); ECF No. 86-114 (Def. Ex. 112).

Dr. Russell Davis was appointed by the University in 2016 to serve as an Assistant Professor in the Department's CCLP, at a starting salary of $65,000. ECF No. 86-116 (Def. Ex. 114) at 2, ¶ 3; ECF No. 86-117 (Def. Ex. 115). It is undisputed that Dr. Davis holds a Ph.D. in Higher Education Administration from Morgan State University, and that after receiving his doctorate, he served as President of Gloucester Community College for five years. ECF No. 86-116 (Def. Ex. 114) at 2, ¶ 3; *id.* at 12-18. Defendants allege that Dr. Prime recommended a starting salary of $65,000 for Dr. Davis, because, among other things, he held a degree in Higher Education Administration and his experience as a community college President made him a good fit for the CCLP. *Id.* at 3, ¶ 5.

Dr. Uttam Gaulee was hired by the University in 2017 as an Assistant Professor in the Department's CCLP, at a starting salary of $65,000. ECF No. 86-116 (Def. Ex. 114) at 3, ¶ 6; ECF No. 86-118 (Def. Ex. 116). It is undisputed that, before coming to the University, Dr. Gaulee taught courses on the community college at the University of Florida, and that his professional experience focused on the community college sector. ECF No. 86-116 (Def. Ex.

114) at 4, ¶ 7.  Defendants allege that Dr. Prime recommended a starting salary of $65,000 for
Dr. Gaulee, because of his prior experience teaching courses related to the community college
and his experience in community college-related organizations.  *Id.* at 4, ¶ 8.

Dr. Omari Jackson was hired by the University in 2017 as an Assistant Professor in the
Department's Urban Educational Leadership Program, at a starting salary of $65,000.  ECF No.
86-116 (Def. Ex. 114) at 4, ¶ 9; ECF No. 86-119 (Def. Ex. 117).  It is undisputed that  Dr.
Jackson holds a Ph.D. in Sociology and that, prior to his appointment, Dr. Jackson served as an
Assistant Professor in the University's Department of Sociology.  ECF No. 86-116 (Def. Ex.
114) at 5, ¶ 10.  Defendants allege that Dr. Prime recommended Dr. Jackson's starting salary so
that he could retain the same salary upon his transfer to SEUS from the University's
Department of Sociology.  *Id.*

Dr. Chad Kee was hired in 2019 as an Assistant Professor in the Department's Higher
Education Program, at a starting salary of $65,000.  ECF No. 86-116 (Def. Ex. 114) at 5, ¶ 11.  It
is undisputed that Dr. Kee was hired as an Assistant Professor after serving two years as an
adjunct professor.  *Id.*  Defendants allege that Dr. Kee's qualifications were a match for the
Higher Education Program, which is one of the more difficult programs to fill, and that his
starting salary was commensurate with what other Assistant Professors were paid at that time.
*Id.*

Wilbur Hicks was hired by the University in 2013 as a Lecturer in the Department's
CCLP, at a starting salary of $55,000.  ECF No. 86-116 (Def. Ex. 114) at 5, ¶ 12.  It is
undisputed that Mr. Hicks has never been a tenure-track faculty member at the University and
that, at the time of his hire, his salary was paid out of Title III grant funds.  *Id.*; *see also* ECF No.
86-53 (Def. Ex. 51, Anderson Tr.) at 10 (122:5-15).  Defendants allege that Dr. Prime played no
role in recommending Dr. Jackson's salary.  *Id.*

Dr. Krishna Bista was hired by the University in 2019 as an Assistant Professor in the
Department's CCLP, at a starting salary of $75,000.  *See* ECF No. 86-116 (Def. Ex. 114) at 6, ¶
14; ECF No. 86-120 (Def. Ex. 118).  It is undisputed that Dr. Bista holds a Ph.D. in Leadership
for Higher Education and that he pursued a concentration in Community College Leadership.
ECF No. 86-116 (Def. Ex. 114) at 6, ¶ 15.  It is also undisputed that, at the time of his
appointment, Dr. Bista had ten years of combined graduate and undergraduate teaching
experience and a strong publication record.  *Id.*  Defendants allege that Dr. Prime recommended

Dr. Bista's starting salary because his educational background, experience and strong publication record made him a good fit for the CCLP.  *Id.*

Dr. Kmt Gerald Shockley was hired by the University in 2010 as an Associate Professor in the Department's Urban Education Leadership Program, at a starting salary of $85,000.  ECF No. 86-116 (Def. Ex. 114) at 6, ¶ 16; ECF No. 86-121 (Def. Ex. 119).  It is undisputed that at the time of his hire, Dr. Shockley was already a tenured Associate Professor at George Mason University and a nationally recognized scholar in the field of urban education, and that he had a strong publication record.  ECF No. 86-116 (Def. Ex. 114) at 7, ¶ 17; *id.* at 20-27.  Defendants allege that Dr. Prime recommended Dr. Shockley's starting salary, because of: (1) his rank; (2) the fact that he was already an Associate Professor with tenure at George Mason University; (3) his strong publication record; and (4) the close fit between his degree, experience and scholarship.  ECF No. 86-116 (Def. Ex. 114) at 7, ¶ 17.

Dr. C. Sean Robinson was hired by the University in 2012 as an Associate Professor in the Department's Higher Education Program, at a starting salary of $80,000.  *See* ECF No. 86-116 (Def. Ex. 114) at 7, ¶ 18; ECF No. 86-122 (Def. Ex. 120).  It is undisputed that Dr. Robinson holds a Ph.D. in Higher Education Leadership and Policy Analysis from the University of Wisconsin-Madison.  ECF No. 86-116 (Def. Ex. 114) at 7, ¶ 19; *id.* at 29-40.  At the time of his hire, Dr. Robinson was working as an Associate Professor in Educational and Organization Leadership at Argosy University and he had a strong publication record.  *Id.*  Defendants allege that Dr. Prime recommended Dr. Robinson's starting salary, because of: (1) his rank; (2) his experience teaching courses in higher education administration and guiding dissertations; and (3) the close fit between his degree and experience and the needs of the Higher Education Program.  ECF No. 86-116 (Def. Ex. 114) at 7, ¶ 19.

Lastly, Dr. Benjamin Welsh was hired by the University in 2009 as an Associate Professor in the Department's Urban Education Leadership Program, at a starting salary of $70,000.  ECF No. 86-116 (Def. Ex. 114) at 8, ¶ 20; ECF No. 86-123 (Def. Ex. 121).  It is undisputed that Dr. Welsh holds a Ph.D. in Education from the University of Pennsylvania.  ECF No. 86-116 (Def. Ex. 114) at 8-9, ¶ 21; *id.* at 42-44.  Defendants allege that Dr. Prime recommended Dr. Welsh's starting salary, because his experience and qualifications were a good match for the Urban Education Leadership Program and his publication record matched the level of an Associate Professor.  *Id.*

<u>Plaintiff's EEO Complaints</u>

Plaintiff filed her original charge of discrimination against the University with the Equal Employment Opportunity Commission ("EEOC") in September 2017, alleging discrimination upon the basis of sex and age, retaliation, and unequal pay.  ECF No. 86-124 (Def. Ex. 122).  On January 6, 2018, Plaintiff amended her charge.  ECF No. 86-125 (Def. Ex. 123).

On April 11, 2019, the EEOC issued a finding that there was reasonable cause to believe that Plaintiff had been subjected to sex discrimination, unequal pay and retaliation.  ECF No. 95-4 (Pl. Ex. 4).  On September 20, 2019, the United States Department of Justice issued a notice that it was declining to file suit on behalf of Plaintiff and notifying Plaintiff of her right to sue.  ECF No. 86-126 (Def. Ex. 124).[5]

On December 19, 2019, Plaintiff filed the complaint in this matter.  ECF No. 1.  On June 16, 2020, Plaintiff filed a second charge of discrimination with the EEOC, in which she challenged the University's decision to deny the 2019 Promotion Application and her non-selection to the Higher Education Program faculty position.  ECF No 86-127 (Def. Ex. 125).  On February 9, 2021, the EEOC issued its right-to-sue notice, which stated that Plaintiff had 90 days from the date of the notice to file suit.  ECF No. 86-128 (Def. Ex. 126).  On June 29, 2021, Plaintiff filed an amended complaint, adding discrimination claims based upon the denial of the 2019 Promotion Application and her non-selection for the Higher Education Program position, by leave of the Court.  ECF Nos. 42, 43.

<u>The Plaintiff's Allegations</u>

In the amended complaint, Plaintiff alleges that she was underpaid, when compared to her male colleagues, during her time working at the University.  ECF No. 43-1 ¶¶ 20, 22.  In this regard, Plaintiff alleges that Defendants improperly gave her a low starting salary and that Defendants continued to underpay her during her tenure at the University.  *Id.* at ¶¶ 24-31.

Plaintiff also alleges that Defendants have engaged in a pattern of discrimination and retaliation with regards to her professional career.  ECF No. 95-1 at 22.  In this regard, Plaintiff alleges that this pattern began with the University's mishandling of her first-year

---

[5] Plaintiff also alleges that she filed an internal EEO complaint with the University in April 2018.  ECF No. 43-1 ¶ 73.

faculty review, and continued during her 2016 Tenure Application and during the 2019-20 and 2020-21 academic years.  *Id.*

In addition, Plaintiff alleges that the Defendants interfered with her rights under the FMLA, because the University did not restore her to an "equal position with equal pay," and retaliated against her by: (1) not allowing her to teach during the 2018 spring semester; (2) only assigning her one summer course; and (3) subjecting her to reporting requirements.  ECF No. 95-1 at 81-82; ECF No. 43-1 ¶ 172.

Lastly, Plaintiff alleges that Dr. Prime specifically exhibited discriminatory animus toward her, because Steven LeBoon represents that Dr. Prime: (1) communicated to him that she would block Plaintiff's chances of receiving tenure; (2) called Plaintiff a "reject lesbian;" and (3) told him that Plaintiff was a "disgusting lesbian and another reason why I unpaid (sic) her so she will leave my campus, very soon . . . [.]"  ECF No. 96 at 41-42.  And so, Plaintiff seeks, among other things, back pay, front pay, appointment to a tenured Full Professor position at the University, certain other injunctive relief and to recover attorney's fees and costs from Defendants.  ECF No. 43-1 at 44-45.

### B.  Procedural History

Plaintiff commenced this action on December 13, 2019.  ECF No. 1.  On June 29, 2021, Plaintiff filed an amended complaint, by leave of the Court.  ECF Nos. 42, 43.

On February 16, 2023, Defendants filed a motion for summary judgment, pursuant to Fed. R. Civ. P. 56; and a memorandum in support thereof.  ECF Nos. 86 and 86-1.  On May 15, 2023, Plaintiff filed a response in opposition to the Defendants' motion for summary judgment; a cross-motion for partial summary judgment, pursuant to Fed. R. Civ. P. 56; and a memorandum in support thereof.  ECF Nos. 95 and 95-1.

On July 5, 2023, Defendants filed a response in opposition to Plaintiff's cross-motion for partial summary judgment and a reply brief.  ECF No. 101.  On August 18, 2023, Plaintiff filed a reply brief.  ECF No. 105.

The parties' cross-motions for summary judgment having been fully briefed, the Court resolves the pending motions.

### III.    LEGAL STANDARDS

#### A.    Fed. R. Civ. P. 56

A motion for summary judgment filed pursuant to Fed. R. Civ. P. 56 will be granted only if there exists no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.  *See* Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  And so, if there clearly exist factual issues "that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party," then summary judgment is inappropriate. *Anderson*, 477 U.S. at 250; *see also Pulliam Inv. Co. v. Cameo Props.*, 810 F.2d 1282, 1286 (4th Cir. 1987); *Morrison v. Nissan Motor Co.*, 601 F.2d 139, 141 (4th Cir. 1979).

When ruling on a motion for summary judgment, the Court must construe the facts alleged in the light most favorable to the party opposing the motion.  *See United States v. Diebold*, 369 U.S. 654, 655 (1962); *Gill v. Rollins Protective Servs. Co*., 773 F.2d 592, 595 (4th Cir. 1985).  In this regard, the moving party bears the burden of showing that there is no genuine issue as to any material fact and that the party is entitled to judgment as a matter of law.  *See* Fed. R. Civ. P. 56(c); *Catawba Indian Tribe of S.C. v. South Carolina*, 978 F.2d 1334, 1339 (4th Cir. 1992).  But, a party who bears the burden of proof on a particular claim must also factually support each element of his or her claim.  *See Celotex Corp.*, 477 U.S. at 322-23.  Given this, "a complete failure of proof concerning an essential element . . . necessarily renders all other facts immaterial."  *Id.* at 323.  And so, on those issues on which the nonmoving party will have the burden of proof, it is the nonmoving party's responsibility to confront the motion for summary judgment with an affidavit or other similar evidence in order to show the existence of a genuine issue for trial.  *See Anderson*, 477 U.S. at 256.

In this regard, the United States Court of Appeals for the Fourth Circuit has held that, "(a) mere scintilla of evidence in support of the nonmovant's position will not defeat a motion for summary judgment."  *Detrick v. Panalpina, Inc*., 108 F.3d 529, 536 (4th Cir. 1997) (citing *Anderson*, 477 U.S. at 247-48).  When faced with cross-motions for summary judgment, the Court must review each motion separately on its own merits "to determine whether either of the parties deserves judgment as a matter of law."  *Rossignol v. Voorhaar*, 316 F.3d 516, 523 (4th Cir. 2003) (quoting *Philip Morris Inc. v. Harshbarger*, 122 F.3d 58, 62 n.4 (1st Cir.1997) (citation and internal punctuation omitted).

### B.  Title VII Discrimination And Retaliation Claims

Title VII prohibits employment discrimination based on race, color, religion, sex and national origin.  *See* 42 U.S.C. § 2000e.[6]  In this regard, Title VII requires that a plaintiff file a charge of discrimination with the EEOC before filing suit in this Court.  42 U.S.C. § 2000e-5(f)(1) (permitting civil suit by the "person claiming to be aggrieved" after filing of a charge with the EEOC and upon receipt of a right-to-sue letter); *see also Puryear v. Cnty. of Roanoke*, 214 F.3d 514, 518 (4th Cir. 2000) ("[T]he aggrieved person may initiate a civil action based on the Title VII claims made in her EEOC charge only after receipt of a right-to-sue letter."); *Miles v. Dell, Inc*., 429 F.3d 480, 491 (4th Cir. 2005).  Upon receipt of a right-to-sue letter from the EEOC, a plaintiff must file suit within 90 days.  *Fisher v. Md. Dep't of Hous. & Cmty. Dev.*, 32 F. Supp. 2d 257, 264 (D. Md. 1998) ("failure to file suit within ninety days after receipt of a notice from the EEOC renders a plaintiff's action untimely"); *Weathersbee v. Baltimore City Fire Dep't*, 970 F. Supp. 2d 418, 427 (D. Md. 2013) (noting that "the ninety-day limit is strictly enforced.").  This "exhaustion requirement ensures that the employer is put on notice of the alleged violations so that the matter can be resolved out of court if possible."  *Miles*, 429 F.3d at 491.  Exhaustion under Title VII limits the scope of a plaintiff's lawsuit to those parties and claims named in the administrative charge.  *See* 42 U.S.C. § 2000e-5(f)(1); *Sydnor v. Fairfax Cnty.*, 681 F.3d 591, 593 (4th Cir. 2012).

Title VII also requires that an aggrieved party file a charge with the EEOC "within one hundred and eighty days after the alleged unlawful employment practice occurred."  42 U.S.C. § 2000e–5(e)(1); *Fort Bend Cnty., Tex. v. Davis*, 139 S. Ct. 1843, 1847 (2019).  And so, if a plaintiff "fails to file an administrative charge with the EEOC within one hundred eighty . . . days after an alleged discriminatory act occurs (or three hundred . . . days if the aggrieved person presented the claim to a state deferral agency), then the EEOC charge is not considered timely filed."  *Hentosh v. Old Dominion Univ.*, 767 F.3d 413, 417 (4th Cir. 2014) (citing 42 U.S.C. § 2000e-5(e)(1)).  And so, the Court cannot consider matters that were not properly raised during the EEOC process, even when a plaintiff has filed a timely claim with the EEOC.  *See, e.g.*,

---

[6] The MFEPA "is the state law analogue of Title VII."  *Alexander v. Marriott Int'l, Inc*., No. 09-2402, 2011 WL 1231029, at *6 (D. Md. Mar. 29, 2011).  When a plaintiff has not asserted a distinction between a federal and Maryland discrimination claims, the Court may apply the same standards to the analysis of the state and federal discrimination claims.  *See Blakes v. City of Hyattsville*, 909 F. Supp. 2d 431, 444 (D. Md. 2012).

*Jones v. Calvert Grp.*, 551 F.3d 297, 300 (4th Cir. 2009) (quoting *Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 963 (4th Cir. 1996) ("'Only those discrimination claims stated in the initial charge, those reasonably related to the original complaint, and those developed by reasonable investigation of the original complaint may be maintained in a subsequent Title VII lawsuit.'"); *Mile*s, 429 F.3d at 491.

There are two methods for proving intentional discrimination in employment under Title VII: (1) through direct or indirect evidence of intentional discrimination, or (2) through circumstantial evidence under the three-step, burden-shifting scheme set forth by the Supreme Court in *McDonnell-Douglas Corp. v. Green*, 411 U.S. 792, 802-05 (1973). For the first method, an employee may utilize "ordinary principles of proof using any direct or indirect evidence relevant to and sufficiently probative of the issue." *Brinkley v. Harbour Recreation Club*, 180 F.3d 598, 606-07 (4th Cir. 1999) (quoting *Tuck v. Henkel Corp.*, 973 F.2d 371, 374 (4th Cir. 1992)). To overcome a summary judgment motion, a plaintiff "'must produce direct evidence of a stated purpose to discriminate and/or [indirect] evidence of sufficient probative force to reflect a genuine issue of material fact.'" *Id.* at 607 (quoting *Goldberg v. B. Green & Co., Inc.*, 836 F.2d 845, 848 (4th Cir. 1988) (brackets existing)). In this regard, comments proffered as direct evidence of discrimination must be made by a final decision maker involved in the alleged adverse employment action. *Hill v. Lockheed Martin Logistics Mgmt.*, 354 F.3d 277, 289 (4th Cir. 2004); *Schafer v. Md. Dep't of Health & Mental Hygiene,* 359 F. App'x 385, 389 (4th Cir. 2009). The Fourth Circuit has also held that comments made years before the alleged adverse employment action were too remote from the alleged adverse employment action to constitute direct evidence of discrimination. *Birckbeck v. Marvel Lighting Corp.*, 30 F.3d 507, 511-12 (4th Cir. 1994).

If direct or indirect evidence of intentional discrimination is lacking, a plaintiff may proceed under *McDonnell-Douglas*. *See Tuck*, 973 F.2d at 375. Under the *McDonnell-Douglas* framework, a plaintiff must first establish a *prima facie* case of discrimination. *See McDonnell-Douglas Corp.*, 411 U.S. at 802. A plaintiff alleging sex discrimination based upon the denial of tenure or a promotion can establish a *prima facie* case of discrimination by showing that: (1) she is a member of a protected group; (2) she applied for promotion and/or tenure; (3) she was qualified for promotion and/or tenure; and (4) the university denied her promotion and/or tenure in favor of someone not a member of the protected group under circumstances giving rise to an

inference of unlawful discrimination.  *Alvarado v. Bd. of Trs. of Montgomery Cnty. Comm. Coll.*, 928 F.2d 118, 121 (4th Cir. 1991); *Evans*, 80 F.3d at 959-960.  In this regard, the Fourth Circuit has held that the review of professorial tenure and promotion decisions should afford deference to the university's determination regarding a candidate's scholarly potential.  *Jiminez v. Mary Washington Coll.*, 57 F.3d 369, 376 (4th Cir. 1995); *see also Smith v. Univ. of N.C.*, 632 F.2d 316, 345 (4th Cir. 1980) (citations omitted).

Title VII also provides that an employer cannot "discriminate against any individual with respect to (her) compensation . . . because of such individual's . . . sex."  42 U.S.C. § 2000e-2(a)(1).  To prevail on a sex-based wage discrimination claim under Title VII, a plaintiff must also prove intentional discrimination.  *Spencer v. Va. State Univ.*, 919 F.3d 199, 207 (4th Cir. 2019).  Where a plaintiff's *prima facie* case of wage discrimination is based upon comparators, the plaintiff must show that she is paid less than individuals of the other gender in similar jobs. *Id*.  If a plaintiff establishes a *prima facie* case of discrimination, the burden-shifting analysis under the *McDonnell-Douglas* framework then applies.  *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142 (2000) (citing *Tex. Dept. of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254 (1981)).

Title VII also prohibits an employer from retaliating against an employee for complaining about prior discrimination or retaliation. 42 U.S.C. § 2000e-3(a).  A plaintiff must prove Title VII retaliation claims through either direct evidence of retaliatory animus, or through the *McDonnell-Douglas* framework.  *Foster v. Univ. of Md.-Eastern Shore*, 787 F.3d 243, 249 (4th Cir. 2015).  To prevail on a retaliation claim under the *McDonnell-Douglas* framework, a plaintiff must first establish a *prima facie* case by showing that: (1) she engaged in protected activity; (2) the employer took adverse action against her; and (3) a causal relationship existed between the protected activity and the adverse employment action.  *Foster*, 787 F. 3d. at 250 (internal citation omitted).  If a plaintiff can establish a *prima facie* case of retaliation, the burden then shifts to the defendant to show that its purportedly retaliatory action was in fact the result of a legitimate non-retaliatory reason.  *Id.* (internal citation omitted).  If the employer makes this showing, the burden shifts back to the plaintiff to rebut the employer's

evidence by demonstrating that the employer's purported nonretaliatory reasons were pretextual[.]"  *Id.* at 251 (internal citations omitted).[7]

## C.     The Equal Pay Act And Maryland Wage Discrimination Law

The EPA and its state analogue, the MEWEPA, prohibit an employer from discriminating against an employee on the basis of sex, by paying wages to an employee at a rate less than the rate that the employer pays wages to an employee of the opposite sex.  *See* 29 U.S.C. § 206(d)(1); Md. Code Ann., Labor & Empl. § 3-304.[8]  To prove a violation of the EPA, a plaintiff must establish that: (1) the defendant paid higher wages to an employee of the opposite sex who; (2) performed equal work on jobs requiring equal skill, effort, responsibility; and (3) under similar working conditions.  *Spencer*, 919 F.3d at 203 (citation omitted).  But, unlike a Title VII claim, a plaintiff does not need to prove discriminatory intent to prevail on an EPA claim.  *Id.*

If the plaintiff establishes a *prima facie* case of wage discrimination, the burdens of both production and persuasion shift to the employer to show that the wage differential was justified by one of the four affirmative defenses contained in the statute.  *EEOC v. Md. Ins. Admin.*, 879 F.3d 114, 120 (4th Cir. 2018).  Given this, an employer can show that the wage variation is not due to sex discrimination but is instead based on (1) a seniority system, (2) a merit system, (3) a system which measures earnings by quantity or quality of production, or (4) any factor other than gender to establish an affirmative defense.  29 U.S.C. § 206(d)(1); *Brinkley-Obu v. Hughes Training, Inc.*, 36 F.3d 336, 344 (4th Cir. 1994).  And so, an employer is entitled to summary

---

[7] The Fourth Circuit has long held that Title VII principles apply to employment discrimination claims brought under Title IX, MFEPA and Section 1983.  *See Preston v. Com. of Va. ex rel. New River Cmty. Coll.*, 31 F.3d 203, 206 (4th Cir. 1994) ("[M]ost courts that have addressed the question have indicated that Title VII principles should be applied to Title IX actions, at least insofar as those actions raise employment discrimination claims.") (internal citations omitted); *Hawkins v. Leggett*, 955 F. Supp. 2d 474 (D. Md. 2013), *aff'd sub nom. In re Canarte*, 558 F. App'x 327 (4th Cir. 2014) ("Plaintiff asserts a . . . discrimination claim under . . . [MFEPA].  Courts judge such claims under the same standards as Title VII."); *Causey v. Balog*, 162 F.3d 795, 804 (4th Cir. 1998) (holding that Section 1983 claims should be analyzed using Title VII's method of proof).

[8] This Court has held that the MEWEPA essentially mirrors the EPA and the statute is read in harmony with the EPA.  *See, e.g., Doe v. Catholic Relief Servs.*, 529 F. Supp. 3d 440, 446-47 (D. Md. 2021); *Cohens v. Maryland Dept. of Human Resources*, 933 F. Supp. 2d 735, 745 (D. Md. 2013).

judgment if a rational jury could not have rejected the employer's proffered reasons for the wage disparities. *Md. Ins. Admin.*, 879 F.3d at 122.

### D.     The FMLA

The Family Medical Leave Act allows eligible employees to take "12 workweeks of leave during any 12-month period . . . [i]n order to care for the spouse, or a son, daughter, or parent, of the employee, if such spouse, son, daughter, or parent has a serious health condition." 29 U.S.C. § 2612(a)(1)(c). Claims can be brought under the FMLA for either interference with an entitlement to FMLA leave, or retaliation for exercising the right to FMLA leave. 29 U.S.C. §§ 2615(a), 2617(a).

To prevail on an interference with FMLA leave claim, an employee must show: "(1) that he is entitled to an FMLA benefit; (2) his employer interfered with the provision of that benefit; and (3) that interference caused harm." *Adams v. Anne Arundel Cnty. Pub. Sch.*, 789 F.3d 422, 427 (4th Cir. 2015) (citations omitted). The United States Court of Appeals for the Fourth Circuit has explained that "[t]he substantive rights guaranteed by the FMLA are <u>prescriptive</u>, and a plaintiff seeking redress for employer interference with an entitlement is only required to show that he or she qualified for the right that was denied." *Sharif v. United Airlines, Inc.*, 841 F.3d 199, 203 (4th Cir. 2016) (citing *Yashenko v. Harrah's NC Casino Co., LLC*, 446 F.3d 541, 546 (4th Cir. 2006)) (emphasis in original).

An FMLA retaliation claim is analyzed under the same burden shifting framework that applies to retaliation claims brought pursuant to Title VII. *Adams*, 789 F.3d at 429 (citations omitted). And so, a plaintiff claiming FMLA retaliation must make a *prima facie* showing that: (1) plaintiff engaged in protected activity; (2) the employer took adverse action against the plaintiff; and (3) the adverse action was causally connected to the plaintiff's protected activity. *Yashenko*, 446 F.3d at 551; *see also Sharif*, 841 F.3d at 203 (same). Because a FMLA retaliation claim is "<u>proscriptive</u>," "employer intent . . . is relevant." *Sharif*, 841 F.3d at 203 (emphasis in original).

### E.     Title IX And Section 1983

Title IX prohibits sex discrimination by recipients of federal education funding. 20 U.S.C. § 1681. To state a *prima facie* case of retaliation under Title IX, a plaintiff must establish three elements: that (1) she engaged in protected activity under Title IX; (2) the defendant took an adverse action against her; and (3) there was a causal connection between her

protected activity and the adverse action. *Feminist Majority Found. v. Hurley*, 911 F.3d 674, 694 (4th Cir. 2018). Plaintiffs seeking to establish a Title IX retaliation claim in the Fourth Circuit "must show a retaliatory motive." *Id.* at 696 (citing *Guessous v. Fairview Prop. Invs., LLC*, 828 F.3d 208, 216 (4th Cir. 2016)).

A plaintiff alleging a Section 1983 claim, based upon an equal protection violation against a public employer must prove that: (1) she belongs to a protected class; (2) she suffered an adverse employment action; and (3) such action gives rise to an inference of discrimination. *McRae v. Robeson Cnty. Bd. of Elections*, No. 7:08-CV-93-FL, 2010 WL 883014, at *6 (E.D.N.C. Jan. 27, 2010*), report and recommendation adopted as modified*, No. 7:08-CV-93-FL, 2010 WL 883013 (E.D.N.C. Mar. 8, 2010) (internal citations omitted). Courts have held that Title VII principles apply to employment discrimination claims brought under Section 1983. *Causey v. Balog*, 162 F.3d 795, 804 (4th Cir. 1998).

## IV.    ANALYSIS

Defendants have moved for summary judgment on Plaintiff's employment discrimination claims upon the following grounds: (1) Plaintiff cannot bring her Title VII, Title IX, MFEPA and FMLA claims against the Individual Defendants, because those statutes do not provide for individual liability; (2) Plaintiff's sex discrimination claims based upon the denial of her 2019 and 2020 Promotion Applications are precluded, because she either failed to administratively exhaust these claims, or the claims are untimely; (3) the Court should disregard Plaintiff's direct evidence of discrimination based upon the testimony of Steven LeBoon; (4) Plaintiff cannot prevail on her sex discrimination claims, because she can neither show that the University denied her promotion and tenure applications under circumstances that give rise to an inference of unlawful discrimination, nor establish that Defendants' proffered reasons for denying her tenure and promotion were pretextual; (5) Plaintiff's retaliation claims must fail, because she cannot show that retaliatory animus was the but-for cause of Defendants' alleged adverse employment actions; (6) Plaintiff cannot prevail on her wage discrimination claims, because her Title VII-based wage discrimination claim is untimely and Defendants have shown no evidence to show that the pay disparity between Plaintiffs and the male comparators was not based upon factors other than gender; and (7) the undisputed material facts show that Plaintiff cannot prevail on her FMLA interference and retaliation claims, because it is undisputed that Plaintiff was returned to her Assistant Professor position following her FMLA leave and Plaintiff cannot show that she

suffered a materially adverse employment action as a result of taking FMLA leave.  *See generally* ECF No. 86-1.  And so, Defendants request that the Court enter summary judgment in their favor and dismiss this matter.  *Id.* at 63.

Plaintiff counters in her response in opposition and cross-motion for partial summary judgment that the Court should deny Defendants' motion, because: (1) her sex discrimination claims based upon the 2019 and 2020 Promotion Applications have been fully exhausted and are timely, under the "relation-back" and "reasonably related" doctrines; (2) the undisputed material facts show that she has proffered both direct and indirect evidence to show sex discrimination; (3) there is direct and indirect evidence of sex discrimination and retaliatory animus in this case; (4) the undisputed material facts show that Defendants interfered with her FMLA rights and retaliated against her for taking FMLA leave; and (5) the evidence in this matter supports her Section 1983 discrimination claims.  *See generally* ECF No. 95-1.

In addition, Plaintiff moves for summary judgment on her wage discrimination claims, upon the ground that the undisputed material facts show that Defendants violated the federal and state laws that prohibit wage discrimination.  ECF No. 95-1 at 46-57.  And so, Plaintiff requests that the Court deny the Defendants' motion for summary judgment and enter summary judgment in her favor with respect to her wage discrimination claims.  *Id.* at 84.

For the reasons that follow, there is no genuine dispute in this case that Plaintiff cannot bring her Title VII, Title IX, MFEPA and FMLA claims against the Individual Defendants.  The undisputed material facts in this matter also make clear that Plaintiff's sex discrimination claims, based upon the denial of her 2019 and 2020 Promotion Applications, are precluded, because she either failed to administratively exhaust these claims, or the claims are untimely.  The undisputed material facts also show that Plaintiff cannot offer evidence to show that the University denied her 2016 and 2018 promotion and tenure applications under circumstances that give rise to an inference of unlawful sex discrimination, to prevail on her sex discrimination claims.

The unrebutted evidence also shows that Plaintiff cannot prevail on her wage discrimination claims, because the undisputed material facts show that the pay disparity in this case was due to factors other than gender.  In addition, the undisputed material facts also show that Plaintiff cannot establish that Defendants acted with any retaliatory motive, intent, or animus, to prevail on her retaliation claims.  Lastly, the undisputed material facts show that Plaintiff cannot prevail on her FMLA interference and Section 1983 claims, because Plaintiff can

neither show that she was not restored to her position, or lost any benefit to which she was entitled, as a result of taking FMLA leave, nor that the denial of her tenure and promotion applications was due to her gender or retaliatory animus. And so, the Court: (1) GRANTS Defendants' motion for summary judgment; (2) DENIES Plaintiff's cross-motion for partial summary judgment; and (3) DISMISSES the amended complaint.

### A. Plaintiff Cannot Pursue Her Title VII, Title IX, MFEPA And FMLA Claims Against The Individual Defendants

As an initial matter, Defendants persuasively argue that the Court should grant summary judgment in favor of the Individual Defendants named in this matter with regards to Plaintiff's Title VII, Title IX, MFEPA and FMLA claims. It is well established that Title VII, Title IX, the MFEPA and the FMLA do not provide for individual liability. *See e.g., Brooks v. Arthur*, 626 F.3d 194, 203 (4th Cir. 2010) ("Title VII 'foreclose(s) individual liability'"); *Lissau v. So. Food Serv., Inc.*, 159 F.3d 177, 181 (4th Cir. 1998) (holding that "supervisors are not liable in their individual capacities for Title VII violations"); *Jennings v. Frostburg State Univ.*, 2021 WL 5989211, at *8 (D. Md. Dec. 16, 2021) ("(T)he MFEPA does not provide for individual liability."); *Fitzgerald v. Barnstable Sch. Comm.*, 555 U.S. 246, 257 (2009) (Title IX "has consistently been interpreted as not authorizing suit against school officials, teachers, and other individuals."); *Bosse v. Baltimore Cnty.*, 692 F. Supp. 2d 574, 583 (D. Md. 2010) ("public employees cannot be held liable in their individual capacities for violations of the FMLA."). In the amended complaint, Plaintiff asserts employment discrimination claims based upon Title VII, Title IX, the MFEPA and the FMLA against several University officials in their individual capacities. ECF No. 43-1 at 32-43. Because these statutes do not provide for individual liability, Plaintiff cannot pursue these claims. And so, the Court GRANTS Defendants' motion for summary judgment on this issue and DISMISSES Plaintiff's Title VII, Title IX, MFEPA and FMLA claims against the Individual Defendants.

### B. The Court GRANTS Defendants' Motion For Summary Judgment On Plaintiff's Sex Discrimination Claims

#### 1. Plaintiff Failed To Exhaust Her Sex Discrimination Claims Based Upon The Denial Of Her 2020 Promotion Application

The Court must also grant Defendants' motion for summary judgment with regards to Plaintiff's discrimination claims based upon the denial of her 2020 Promotion Application,

because there is no dispute that she has not administratively exhausted these claims.  Before filing suit under Title VII, Plaintiff must exhaust administrative remedies, by filing a charge of discrimination with the EEOC, or with an appropriate state or local agency, within 180 days of the occurrence of the alleged unlawful employment action.  *See* 42 U.S.C. § 2000e-5(e)(1).  And so, Title VII limits the scope of Plaintiff's claims in this case to those parties and claims named in her administrative charge.  *See* 42 U.S.C. § 2000e-5(f)(1); *Sydnor v. Fairfax Cnty.*, 681 F.3d 591, 593 (4th Cir. 2012).

Relevant here, the Supreme Court has held that, to the extent that a Title VII plaintiff sought to recover for discrete acts of alleged discrimination, with respect to which he first filed a discrimination charge with the appropriate state agency, only those acts occurring within 300 days of date that the Title VII Plaintiff filed his charge with the EEOC were actionable under Title VII.  *Nat'l. R.R. Passenger Corp. v. Morgan*, 536 U.S. 101 (2002).  The Fourth Circuit has not directly addressed whether a Title VII Plaintiff must file a supplemental charge with the EEOC, to bring a claim in federal court for discriminatory treatment that occurs after the plaintiff filed the initial EEOC charge.  *Yampierre v. Baltimore Police Dep't*, 2022 WL 3577268, at *23 (D. Md. Aug. 18, 2022).  But, this Court has held, in the wake of *Morgan*, that a later charge of discrimination is necessary for discriminatory treatment that occurs after the plaintiff filed an EEOC charge of discrimination.  *See, e.g., id.*, at *24 (collecting cases); *Brooks v. United Parcel Serv., Inc.*, 2021 WL 4339194, at *6-7 (D. Md. Sept. 23, 2021) (same); *Sharpe v. Prince George's Cnty. Gov't.*, 2021 WL 928177, at *10 (D. Md. Mar. 11, 2021) (dismissing a discrimination claim based on adverse employment actions that took place after plaintiff filed his second charge of discrimination with the EEOC and that were not the subject of the first or second charges); *Garnes v. Maryland,* 2018 WL 276425, at *6 (D. Md. Jan. 3, 2018) (dismissing discrimination claim based on plaintiff's termination, which took place after she filed her charge with the EEOC).

There is no dispute in this case that Plaintiff filed her second charge of discrimination, with the EEOC on June 16, 2020.  ECF No. 86-127 (Def. Ex. 125).  There is also no dispute that this charge does not mention the denial of her 2020 Promotion Application, given that this alleged discriminatory conduct occurred several months after Plaintiff filed that charge.  *Id.*  It is also without dispute that Plaintiff never filed a charge of discrimination related to the denial of her 2020 Promotion Application.  Given this, Plaintiff has not exhausted her administrative

remedies with respect to this claim.  And so, the Court GRANTS the Defendants' motion for summary judgment on these claims, and DISMISSES Plaintiff's sex discrimination claims based upon the denial of her 2020 Promotion Application.

### 2. Plaintiff's Sex Discrimination Claims Based Upon The 2019 Promotion Application Are Untimely

Defendants also persuasively argue that Plaintiff's sex discrimination claims based upon the denial of her 2019 Promotion Application are time-barred.  It is undisputed that Plaintiff raised discrimination claims related to the 2019 Promotion Application in her second EEOC charge of discrimination filed on June 16, 2020.  ECF No. 86-127 (Def. Ex. 125).  It is also undisputed that Plaintiff amended the complaint in this matter to add these claims on June 29, 2021, 140 days after the EEOC issued the right-to-sue letter regarding these claims.  ECF No. 86-128 (Def. Ex. 126); ECF 43-1.

Given these undisputed facts, the Court agrees with Defendants that Plaintiff's claims related to the 2019 Promotion Application are time-barred, because she failed to amend the complaint in this matter within 90 days of the issuance of the EEOC's right-to-sue letter.  *See* 42 U.S.C. § 2000e-5(f)(1); *Fisher v. Md. Dep't of Hous. & Comm. Dev.*, 32 F. Supp. 2d 257, 264 (D. Md. 1998) ("failure to file suit within ninety days after receipt of a notice from the EEOC renders a plaintiff's action untimely"); *Weathersbee v. Baltimore City Fire Dep't*, 970 F. Supp. 2d 418, 427 (D. Md. 2013) (noting that "the ninety-day limit is strictly enforced.").  And so, the Court also GRANTS the Defendants' motion for summary judgment on these claims, and DISMISSES Plaintiff's sex discrimination claims based upon the denial of Plaintiff's 2019 Promotion Application.

### 3. Defendants Are Entitled to Summary Judgment On Plaintiff's Remaining Sex Discrimination Claims

The Court next considers Plaintiff's remaining sex discrimination claims, which are based upon the 2016 Tenure Application and her non-selection for the CCLP Director and Higher Education Program positions.  The undisputed material facts show that Plaintiff cannot prevail on these claims for several reasons.

First, the Court agrees with Defendants that Plaintiff cannot proffer direct evidence of discrimination to support her sex discrimination claims.  To overcome the Defendants' summary judgment motion, Plaintiff "'must produce direct evidence of a stated purpose to discriminate and/or [indirect] evidence of sufficient probative force to reflect a genuine issue of

material fact.'" *Brinkley v. Harbour Recreation Club*, 180 F.3d 598, 607 (4th Cir. 1999) (quoting *Tuck v. Henkel Corp.*, 973 F.2d 371, 374 (4th Cir. 1992)).  And so, Plaintiff must proffer "'evidence of conduct or statements that both reflect directly the alleged discriminatory attitude and that bear directly on the contested employment decision.'"  *Id*. (quoting *Fuller v. Phipps*, 67 F.3d 1137, 1142 (4th Cir. 1995)).

In this case, Plaintiff relies upon the sworn affidavit of Steven LeBoon to show that Dr. Prime harbored discriminatory animus toward her upon the basis of gender.  Mr. LeBoon states in his affidavit that he had two conversations with Dr. Prime in 2014, during which she expressed discriminatory animus toward Plaintiff.  First, Mr. LeBoon states that, on August 20, 2014, Dr. Prime communicated to him that she would block Plaintiff's chances of receiving tenure and that Dr. Prime called Plaintiff a "reject lesbian."  ECF No. 96 at 41-42; ECF No. 86-130 (Def. Ex. 128).  Second, Mr. LeBoon states that during a conversation that occurred on September 22, 2014, Dr. Prime told him that Plaintiff was a "disgusting lesbian and another reason why I unpaid (sic) her so she will leave my campus, very soon."  *Id.*  Defendants deny that Dr. Prime made these statements.  ECF No. 86-1 at 41.

Taken as true, this evidence is not sufficient to establish an inference of intentional sex discrimination.  As Mr. LeBoon's affidavit makes clear, his alleged conversations with Dr. Prime occurred in 2014, which was two years before Plaintiff submitted the 2016 Tenure Application, and three or more years before Plaintiff submitted her successful 2018 Tenure Application and applied for the CCLP Director and the Higher Education Program positions.  Given this, the alleged remarks are too temporally remote to constitute direct evidence of the intentional sex discrimination alleged in this case.  *See Birckbeck v. Marvel Lighting Corp.*, 30 F.3d 507, 511-12 (4th Cir. 1994) (finding a two-year gap between alleged discriminatory remark and the adverse employment action at issue was too remote to constitute direct evidence of discrimination).  The undisputed material facts in this case also make clear that Dr. Prime was neither the only decision maker, nor the final decision maker for any of Plaintiff's applications for tenure and promotion.  Given this evidence, the remarks attributed to Dr. Prime are not sufficient to establish intentional sex discrimination, by direct evidence, with regards to the alleged adverse employment actions.  *Hill v. Lockheed Martin Logistics Mgmt.*, 354 F.3d 277, 289 (4th Cir. 2004); *Schafer v. Md. Dep't of Health & Mental Hygiene,* 359 F. App'x 385, 389 (4th Cir. 2009).

Second, the undisputed material facts also show that Plaintiff cannot establish a *prima facie* case of sex discrimination, because she proffers no evidence to establish an "inference of unlawful discrimination" based upon her gender.  Plaintiff can establish a *prima facie* case of sex discrimination by showing that: (1) she is a member of a protected group; (2) she applied for promotion and/or tenure; (3) she was qualified for promotion and/or tenure; and (4) the University denied her promotion and/or tenure under circumstances giving rise to an inference of unlawful discrimination.  *Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 959-960 (4th Cir. 1996).  But the undisputed material facts here show that Plaintiff cannot meet this burden.

With regards to Plaintiff's 2016 Tenure Application, the undisputed material facts show that the University denied Plaintiff's application due to her lack of a strong publication history at that time.  In this regard, it is undisputed that, after Plaintiff submitted the 2016 Tenure Application, Dr. Prime convened a three-member departmental review committee to review the application.  ECF No. 98-11 (Pl. Ex. 26); ECF No. 86-9 (Def. Ex. 7, Hollis Tr.) at 24 (91:18-92:4); ECF No. 88-3 (Def. Ex. 26); ECF No. 88-4 (Def. Ex. 27); ECF No. 88-5 (Def. Ex. 28); ECF No. 88-6 (Def. Ex. 29) at 2-3, ¶¶ 3-4.  It is also undisputed that two members of the committee, Dr. Welsh and Dr. Spaid, voted in favor of awarding Plaintiff tenure and promotion.  ECF No. 88-4 (Def. Ex. 27); ECF No. 88-5 (Def. Ex. 28); ECF No. 88-6 (Def. Ex. 29) at 2-3, ¶¶ 3-4.  But the third committee member, Dr. Johnson, voted against recommending Plaintiff for tenure and promotion, due to concerns about Plaintiff's publication history.  ECF No. 88-3 (Def. Ex. 26).

The unrebutted evidence also shows that other University officials shared Dr. Johnson's concerns about Plaintiff's publication history.  Notably, it is undisputed that Dr. Prime also recommended that Plaintiff's 2016 Tenure Application be deferred and that Plaintiff be afforded an additional year to improve her submission, due to concerns about Plaintiff's limited publication history.  ECF No. 86-32 (Def. Ex. 30).  The undisputed material facts also show that Dean Welch and the school review committee that she convened to review Plaintiff's application raised similar concerns about the fact that Plaintiff had published in "pay-to-publish" venues.  ECF Nos. 88-8, 88-9, 88-10, 88-1, 88-12 (Def. Exs. 33-37).  Given this, all members of the school review committee voted against granting Plaintiff promotion and tenure.  *Id*.  And so, the University ultimately decided to offer Plaintiff a one-year extension of time to

re-submit her application for tenure and promotion.  ECF No. 86-41 (Def. Ex. 39); ECF No. 86-13 (Def. Ex. 11) at 1, ¶ 2.

While Plaintiff understandably disagrees with the University's decision to deny her 2016 Tenure Application, she points to no evidence to show that this decision was due to her gender.  *See generally* ECF Nos. 43, 95.  Rather, as discussed above, the evidence before the Court shows that several University officials expressed concerns about Plaintiff's publication history and Plaintiff does not dispute this fact.  The Court observes, however, that Plaintiff does argue with some persuasion that the University failed to follow its own APT policy with regards to the review of her 2016 Tenure Application, given, among other things, the significant delay in resolving that application.  ECF No. 95-1 at 13.  But there is no evidence before the Court to show that any deviation from the University's APT Policy was due to Plaintiff's gender.  And so, the undisputed material facts in this case, when construed in the light most favorable to the Plaintiff, show that Plaintiff cannot prevail on her sex discrimination claim based upon the 2016 Tenure Application.

Plaintiff's sex discrimination claims based upon her non-selection for the CCLP Director and Higher Education positions are problematic for similar reasons.  Plaintiff applied for the CCLP Director Position in April 2017, and the University convened a committee to review her application in September 2017.  ECF No. 86-77 (Def. Ex. 75); ECF No. 86-54 (Def. Ex. 52, Dorsey Tr.) at 6 (38:21-39:7); ECF No. 86-53 (Def. Ex. 51, Anderson Tr.) at 19 (222:1-5); ECF No. 86-7 (Def. Ex. 5, Prime Tr. 2) at 15 (190:7-191:20).  Defendants have put forward evidence to show that the individual ultimately selected for this position is a woman and that the committee unanimously recommended that the University hire this applicant, because of her extensive community college leadership experience and extensive connections within the community college sector nationwide.  ECF No. 86-78 (Def. Ex. 76); ECF No. 86-53 (Def. Ex. 51, Anderson Tr.) at 19 (224:18-225:17).  Plaintiff does not dispute this evidence and she points to no evidence to show that the University's decision not to select her for this position was due to her gender.  *See generally* ECF Nos. 43, 95.

Plaintiff similarly fails to point to any evidence to show that she was not selected for the Higher Education Program position because of her gender.  The undisputed material facts show that Plaintiff applied for this position in January 2019.  ECF No. 86-95 (Def. Ex. 93); ECF No. 86-116 (Def. Ex. 114) at 10, ¶ 28.  The undisputed material facts also show that none of the

members of the search committee for this position ranked Plaintiff among the top candidates for the position.  ECF No. 88-6 (Def. Ex. 29) at 3, ¶ 7; ECF No. 86-96 (Def. Ex. 94) at 2, ¶ 3. Defendants also put forward evidence to show that the University ultimately offered this position to a woman candidate, because she had experience in marketing and social media, as well as special skills with technology and online teaching.  ECF No. 86-97 (Def. Ex. 95); ECF No. 86-116 (Def. Ex. 114) at 10, ¶ 29.  Again, Plaintiff does not dispute these facts and she offers no evidence to show that the University did not select her for this position because of her gender.

Given this evidence, Plaintiff simply cannot establish an inference that her gender was the reason for the denial of her applications for tenure and promotion and non-selection.  And so, the Court GRANTS Defendants' motion for summary judgment on Plaintiff's sex discrimination claims.[9]

### C.  Defendants Are Entitled To Summary Judgment On Plaintiff's Wage Discrimination Claims

Turning to Plaintiff's wage discrimination claims, the undisputed material facts also show that Plaintiff cannot prevail on her wage discrimination claims brought pursuant to the EPA and MEWEPA, because the pay disparity between Plaintiff and her male comparators was due to factors other than gender.  To prove a violation of the EPA and its state analogue, the MEWEPA, Plaintiff must establish that: (1) the Defendants paid higher wages to an employee of the opposite sex who; (2) performed equal work on jobs requiring equal skill, effort, responsibility; and (3) under similar working conditions.  *Spencer v. Va. State Univ.*, 919 F.3d 199, 203 (4th Cir. 2019) (citation omitted).  If Plaintiff can establish a *prima facie* case of wage discrimination, the burdens of both production and persuasion shift to her employer to show that the wage differential was justified by one of the four affirmative defenses contained in the statute.  *EEOC v. Md. Ins. Admin.*, 879 F.3d 114, 120 (4th Cir. 2018).  In this regard, an employer can show that the wage variation is not due to sex discrimination, but is, instead, based upon: (1) a seniority system; (2) a merit system; (3) a system which measures earnings by

---

[9] Because Plaintiff cannot establish a *prima facie* case of sex discrimination, the Court does not reach the issues of whether Defendants offer legitimate non-discriminatory reasons for their decisions, or whether Plaintiff can show that those reasons were pretextual.

quantity or quality of production; or (4) any factor other than gender. 29 U.S.C. § 206(d)(1); *Brinkley-Obu v. Hughes Training, Inc.*, 36 F.3d 336, 344 (4th Cir. 1994). And so, the Defendants are entitled to summary judgment on Plaintiff's EPA and MEWEPA wage discrimination claims here, if a rational jury could not have rejected the University's proffered reasons for the wage disparities between Plaintiff and her male comparators. *Md. Ins. Admin.*, 879 F.3d at 122. The Defendants have satisfied this requirement.

In this case, the undisputed material facts show that the wage disparity between Plaintiff and her male counterparts was due to several factors other than gender. The Court observes, as an initial matter, that it is undisputed that Plaintiff's starting salary at the University was $60,000, and Defendants acknowledge that this salary was at the bottom of the starting salary range for Assistant Professors in the CCLP at the time. ECF No. 86-7 (Def. Ex. 5, Prime Tr. 2) at 4-5 (17:6-18:17). It is also undisputed that nine of the ten male comparators identified by Plaintiff received a higher starting salary than Plaintiff, with such salaries ranging between $63,000 to $85,000. *See* ECF No. 86-116 (Def. Ex. 114) at 2-9, ¶¶ 2-21. Given this evidence, the Court agrees with Plaintiff that she has established a *prima facie* case for sex-based wage discrimination under the EPA and MEWEPA. [10]

But the Defendants have advanced substantial evidence to show that the pay disparity between Plaintiff and her male counterparts was due to factors other gender for several reasons. First, the undisputed material facts show that all of the male comparators who were hired as Assistant Professors in the CCLP had more community college-related experience than Plaintiff. Notably, it is undisputed that Dr. Needham Gulley, who was hired by the University in the same year as Plaintiff, had extensive prior experience as a student affairs professional in several community colleges and other two-year higher education institutions. ECF No. 86-17 (Def. Ex. 15, Prime Tr. 1) at 14-16 (79:16-88:9); ECF No. 86-114 (Def. Ex. 112); ECF No. 86-115 (Def. Ex. 113). Dr. Russell Davis, who was hired by the University as an Assistant Professor, also had more significant prior community college experience than Plaintiff, because he served as the

---

[10] Defendants allege that Dr. Prime recommended a lower starting salary for Plaintiff, because of Plaintiff's lack of prior community college-focused experience, specialization, or research, and due to concerns expressed by members of the University's search committee about the quality of the venues in which Plaintiff had published. ECF No. 86-1 at 10-11 (*citing* ECF No. 86-7 (Def. Ex. 5, Prime Tr. 2) at 4-5, 6 (17:19-18:17, 23:19-24:11)). Plaintiff does not dispute that all of her scholarly publications at the time of her hire were self-published by her consulting company. ECF No. 86-9 (Def. Ex. 7, Hollis Tr.) at 6, 60 (17:19-21, 236:7-10); ECF No. 86-15 (Def. Ex. 13).

President of a community college prior to his appointment to a position at the University.  ECF No. 86-116 (Def. Ex. 114) at 3, ¶¶ 4-5; *id.* at 12-18.

The undisputed material facts also make clear that Dr. Uttam Gaulee and Dr. Krishna Bista joined the University after gaining community college experience and expertise at other institutions.  ECF No. 86-116 (Def. Ex. 114) at 4, ¶ 7; 6, ¶ 15.  Notably, it is undisputed that Dr. Gaulee had previously taught courses on the community college at the University of Florida.  *Id.* at 4, ¶ 7.  It is also undisputed that, at the time of his hire, Dr. Bista pursued a concentration in Community College Leadership and that he had ten years of combined graduate and undergraduate teaching experience.  *Id.* at 6, ¶ 15; ECF No. 86-120 (Def. Ex. 118).

The undisputed material facts also show that several of the male comparators had stronger publication histories than Plaintiff had at the time when she was hired by the University.  In this regard, it is undisputed that Dr. Gulley had published in the *Community College Journal of Research and Practice* prior to his hire.  ECF No. 86-17 (Def. Ex. 15, Prime Tr. 1) at 15 (84:15-85:20).  At the time of his appointment, Dr. Bista also had a strong publication record that included three edited volumes, three book chapters, and fifteen peer-reviewed journal articles.  ECF No. 86-116 (Def. Ex. 114) at 6, ¶ 15.  The evidence before the Court also shows that Dr. Shockley had a strong publication record at the time of his hire.  ECF No. 86-116 (Def. Ex. 114) at 7, ¶ 17; *id.* at 20-27.

Lastly, the evidence before the Court shows that the University considered other factors unrelated to gender, such as the unique needs of the University and its departments, in setting the salaries for the male comparators.  For example, Defendants represent that Dr. Prime recommended Dr. Jackson's starting salary, so that he could retain the same salary upon his transfer to SEUS from the University's Department of Sociology.  ECF No. 86-116 (Def. Ex. 114) 5, ¶ 10.  Defendants also represent that Dr. Prime recommended that Dr. Gulley's starting salary be in the middle of the salary range for newly hired Assistant Professors, because his educational background, experience and scholarship made him a good fit for the CCLP.  ECF No. 86-17 (Def. Ex. 15, Prime Tr. 1) at 14-16 (79:16-88:9); ECF No. 86-114 (Def. Ex. 112); ECF No. 86-115 (Def. Ex. 113).  Defendants further represent that Dr. Kee's qualifications were a match for the Higher Education Program, which is one of the more difficult programs to fill, and that his starting salary was commensurate with what other Assistant Professors were paid at that time.   ECF No. 86-116 (Def. Ex. 114) at 5, ¶ 11.

Plaintiff does not dispute any of these facts.  *See generally* ECF Nos. 43, 95, 105.  Nor does Plaintiff point to any evidence to show that the factors other than gender discussed above were not the reason for the disparity between her starting salary and the starting salaries of the male comparators.  *Id*.  Given this, the Court is satisfied that a rational jury would not reject the University's proffered reasons for the wage disparity between Plaintiff and the male comparators.

To the extent that Plaintiff pursues her sex-based wage discrimination claims under Title VII and the MFEPA, the undisputed material facts similarly show that she cannot prevail on such claims.  As discussed above, Plaintiff cannot make a showing of intentional discrimination, because the undisputed material facts show that the reasons for the disparity between Plaintiff's pay and that of the male comparators was due to differences in professional backgrounds, publication histories and the needs of the University.  And so, the Court GRANTS the Defendants' motion for summary judgment on Plaintiff's wage discrimination claims.  For the same reasons, the Court DENIES Plaintiff's cross-motion for summary judgment on her wage discrimination claims.

### D.  Defendants Are Entitled to Summary Judgment On Plaintiff's Retaliation Claims

The unrebutted evidence in this case also shows that Plaintiff cannot prevail on her retaliation claims, brought pursuant to Title VII, the MFEPA, Title IX and the FMLA, because she advances no evidence to show retaliatory animus or motive upon the part of the Defendants.

To prevail on her retaliation claims, Plaintiff must show, among other things, that Defendants were motivated by retaliatory animus in taking the adverse employment actions alleged in this matter.  *See Guessous v. Fairview Prop. Invs*., LLC, 828 F.3d 208, 217 (4th Cir. 2016) (Title VII); *Feminist Majority Found. v. Hurley*, 911 F.3d at 694, 696 (Title IX); *Sharif v. United Airlines, Inc.*, 841 F.3d 199, 203 (4th Cir. 2016) (FMLA).  And so, if Plaintiff cannot put forward evidence to show retaliatory animus or motivation on the part of the Defendants, she cannot prevail on her retaliation claims.

Plaintiff alleges in this case that she engaged in protected activity by filing an internal EEO complaint on April 4, 2018, and two charges of discrimination with the EEOC on September 26, 2017, and June 16, 2020, respectively.  ECF No. 86-124 (Def. Ex. 122); ECF No. 86-125 (Def. Ex. 123).  Plaintiff also alleges that the University retaliated against her for

engaging in this protected activity by: (1) converting her to an at-will employee on December 12, 2017, and (2) "den[ying] nearly every promotion or position to which she has applied." ECF No. 96-1 at 77; ECF No. 88-17 (Def. Ex. 47) at 3.

Plaintiff does not, however, point to any evidence to show that this conduct was in retaliation for her having engaged in the aforementioned protected activities. Notably, as discussed above, the undisputed material facts show that the University did not select Plaintiff for the CCLP Director and Higher Education Program positions, because the University identified better qualified individuals for these positions. Plaintiff identifies no evidence to show that the individuals who reviewed her applications for these positions were motivated by retaliatory animus, or that these individuals were even aware of her protected activities. *See* ECF No. 95-1 at 76-78. Nor does Plaintiff identify any evidence to show that the University's decision to convert her to an at-will employee was motivated by retaliatory animus. *Id.*

Because Plaintiff fails to identify any facts to rebut the evidence before the Court showing that the Defendants' decisions regarding her tenure and promotion applications and designation as an at-will employee were not motivated by retaliatory animus, the Court agrees with Defendants that Plaintiff cannot prevail on her Title VII, MFEPA and Title IX retaliation claims. And so, the Court GRANTS the Defendants' motion for summary judgment on these claims.

Plaintiff's FMLA retaliation claim is equally problematic. Plaintiff contends that the University retaliated against her in violation of the FMLA, because she: (1) was not allowed to teach during the 2018 spring semester; (2) was assigned to teach only one summer course in 2018; and (3) was subjected to reporting requirements after returning from FMLA leave. ECF No. 95-1 at 81-82; ECF No. 43-1 ¶ 172. With regards to Plaintiff's teaching responsibilities during the spring 2018 term, the Defendants acknowledge that Plaintiff was not permitted to resume teaching classes when she returned to work. *See* ECF No. 86-1 at 18. But Defendants explain that the reason Plaintiff was not allowed to immediately resume teaching courses was due to the timing of her return to work. *Id.* Plaintiff does not dispute that she returned to work just a few weeks before the spring semester would conclude. *See generally* ECF Nos. 43, 95.

Defendants also state that the University's decision to have Plaintiff submit weekly reports, upon her return to work, was to document Plaintiff's activities, because she was not teaching classes while receiving a full salary. ECF No. 86-54 (Def. Ex. 52, Dorsey Tr.) at 8-9

(133:5-22; 136:12-19).  Plaintiff, again, advances no evidence to rebut the reasons proffered by the Defendants for this challenged employment action.  *See* ECF No. 95-1 at 81-82.  And so, Plaintiff cannot show that the University's actions following her return to work after taking FMLA leave were motivated by retaliatory animus, to create a genuine issue for trial.

Plaintiff also proffers no evidence to show that the University's decision to assign her only one summer course in summer 2018 was motivated by retaliatory animus.  Plaintiff acknowledges that the University reached out to her after she requested FMLA leave so that she could express an interest in teaching summer courses.  ECF No. 43-1 ¶ 63.  It is also undisputed that Plaintiff was assigned to teach one summer course in 2018, and that she was compensated for this work.  ECF No. 86-59 (Def. Ex. 57) at 4.  Again, Plaintiff identifies no evidence to show that Defendants assigned her only one summer course because she previously took FMLA leave.  *See generally* ECF Nos. 43, 95.  The undisputed material facts also make clear that that the reduction in the salary that Plaintiff earned during the summer of 2018 was due to the fact that she taught only one summer course, rather than due to any retaliatory intent upon the part of Defendants.  ECF No. 86-59 (Def. Ex. 57); ECF No. 86-54 (Def. Ex. 52, Dorsey Tr.) at 7, 11 (99:15-17, 151:3-152:2); ECF No. 86-60 (Def. Ex. 58, Grant Tr.) at 6 (71:1-72:21).  Given this evidence, the Court also GRANTS the Defendants' motion for summary judgment on Plaintiff's FMLA retaliation claim.[11]

### E.  Defendants Are Entitled To Summary Judgment On Plaintiff's FMLA Interference And Section 1983 Claims

As a final matter, the undisputed material facts similarly show that Plaintiff cannot prevail on her FMLA interference and Section 1983 claims.  To prevail on her FMLA interference claim, Plaintiff must show that: (1) she is entitled to an FMLA benefit; (2) the Defendants interfered with the provision of that benefit; and (3) the interference caused her harm.  *Adams v. Anne Arundel Cnty. Pub. Sch*., 789 F.3d 422, 427 (4th Cir. 2015) (citations omitted).  In this regard, the FMLA requires that use of leave "shall not result in the loss of any employment benefit accrued prior to the date on which the leave commenced."  29 U.S.C. §

---

[11] Plaintiff also cannot establish a materially adverse employment action to prevail on her FMLA retaliation claim, because it is undisputed that Plaintiff was restored to her position as a tenure-track Assistant Professor after returning from FMLA leave.  *See generally* ECF Nos. 43, 95; *see Csicsmann v. Sallada*, 211 F. App'x 163, 168 (4th Cir. 2006).

2614(a)(2).  But a restored employee is not entitled to "any right, benefit, or position of employment other than any right, benefit, or position to which the employee would have been entitled had the employee not taken the leave."  *Id*. at § 2614(a)(3)(B).

Here, the unrebutted evidence makes clear that Plaintiff was restored to her position as a tenure-track Assistant Professor following her FMLA leave.  ECF No. 88-19 (Def. Ex. 56); ECF No. 86-13 (Def. Ex. 11) at 1, ¶ 2.  There is also no dispute in this case that Plaintiff had no right to teach a certain number of summer courses at the University.  ECF No. 86-1 at 19; *see also* ECF No. 86-54 (Def. Ex. 52, Dorsey Tr.) at 7, 11 (99:15-17, 151:3-152:2); ECF No. 86-60 (Def. Ex. 58, Grant Tr.) at 6 (71:1-72:21).  Given this evidence, Plaintiff cannot show that she was denied any benefit, to which she was entitled upon her return to work, in violation of the FMLA.  ECF No. 95-1 at 80.  And so, the Court must also GRANT the Defendants' motion for summary judgment on Plaintiff's FMLA interference claim.

Because the undisputed material facts show that the alleged adverse employment actions in this matter were not based upon Plaintiff's gender, Plaintiff also cannot prevail on her Section 1983 claims against the Individual Defendants.  The Fourth Circuit has long held that Title VII principles should apply to employment discrimination claims brought under Section 1983.  *Causey v. Balog*, 162 F.3d 795, 804 (4th Cir. 1998) (Section 1983 claims should be analyzed using Title VII's methods of proof).  And so, to prevail on her Section 1983 claims here, Plaintiff must show, among other things, that the Individual Defendants' decisions to deny her a promotion or tenure were motivated by her gender or retaliatory animus.  *Evans*, 80 F.3d at 959; *Guessous*, 828 F.3d at 217.  As discussed above, Plaintiff cannot make such a showing. And so, the Court also GRANTS the Defendants' motion for summary judgment on these final claims.

## V.    CONCLUSION

In sum, the undisputed material facts in this matter make clear that Plaintiff's sex discrimination claims, based upon the denial of her 2019 and 2020 Promotion Applications are precluded, because she either failed to administratively exhaust these claims, or the claims are untimely.  The undisputed material facts also show that Plaintiff cannot offer evidence to show that the University denied any of her applications for promotion and tenure under circumstances that give rise to an inference of unlawful sex discrimination.

In addition, the unrebutted evidence shows that Plaintiff cannot prevail on her wage discrimination claims, because the pay disparity in this case was due to factors other than gender. The undisputed material facts similarly show that Plaintiff cannot establish that any of the alleged adverse employment actions in this matter were motivated by retaliatory animus, or motive, to prevail on her retaliation claims.  Lastly, the undisputed material facts show that Plaintiff cannot prevail on her FMLA interference and Section 1983 claims, because Plaintiff cannot show she was denied any benefit to which she was entitled upon her return to work, or that the denial of any of her tenure and promotion applications were due to her gender or retaliatory animus.

And so, for the foregoing reasons, the Court:

1. **GRANTS** Defendants' motion for summary judgment;

2. **DENIES** Plaintiff's cross-motion for partial summary judgment; and

3. **DISMISSES** the amended complaint.

A separate Order shall issue.

s/Lydia Kay Griggsby
LYDIA KAY GRIGGSBY
United States District Judge

39